Good morning, your honors. My name is John Einhorn. I represent the appellant Ian Bick and I represented him at trial. Ian Bick was under 18 years old when he committed the offenses that the government has charged him with. He went out and he found a civil lawyer, not me, but he found a lawyer in Danbury to draft a loan agreement. The loan agreement is set forth among other places on page 20 of my memo. Basically it characterizes the document as being, it says, this loan is made for business purposes and the proceeds are being used to fund the business operations. Like buying a jet ski? Yes, sir. Like buying a jet ski as a business purpose? Well, that was, that's an interesting question. The jet ski wasn't, um, that wasn't one of the charges for, for the fraud, for the fraudulent conduct. The jet ski was part of a money laundering account and the money laundering account raises other issues as to whether or not the government has identified the unlawful source of the funds. Because in the indictment, just to jump to this point, since Your Honor raises it, the indictment raised talks about three separate people who, who gave money or loan money to Ian Bick. Some of which was, was, was more than likely was proved to be used for the jet ski purchases. But it's not, it was never proven as to what the source of those funds was from the, any of those three people. I had requested interrogatories to the jury, the judge didn't. I don't know what you mean the source of the money. I thought the government's bank account. He then deposits a check from one of the victims who specifically identified in the mail fraud count that the jury found the defendant guilty of into that account. And then he takes money out of that account, uh, to the tune of $20,000 to buy the jet skis. He had commingled, he had commingled very... He commingled it with nothing. He had a thousand dollars in the bank account. I thought that was the government's proof. Am I wrong about that? Well, yes, he had a thousand dollars in the account at that time. Again, this, this we're talking about in response to your Honor's query, we're talking only about the money laundering count, not about the fraud counts. There was no specific fraud count. But isn't the whole point of the fraud count that he represented he was going to use the money for one purpose and there's evidence that he used it for personal purposes? Well, if you look again, there's, there's, um, the government put on 11 people who testified in this particular case. And then another nine contracts, which I'll address that going, getting back to the confrontation clause issue again, that your Honor's just heard. But, but on those 11 people, um, the question was, was it a loan? Did he have the right to, to, to soak, the government calls it a Ponzi scheme. Mr. Bick characterized it as a refinancing. In other words, he got the money from one person to pay another back. It was businesses do that all the time with, with regard to refinancing and so forth. So his, his, that's all a jury question. The fact the, the evidence could support the view that he asked for money on the representation that he was going to use it for business purposes. And then he didn't. And a jury could reasonably find that. Isn't that right? I think with focusing on the, on the jet skis, just for a second, forget the jets. Is that in general, not true? The jet skis would just be one example of that. There's purchases and other luxury goods of various kinds. I think there was, I think the evidence of trial was, was just that. And, and our, our argument against that was that, uh, but these, these were loans and he could do with the money, basically what he wanted with the exception. Why, why, why do you say that? If I asked to borrow money for, for somebody on the representation that it is a loan to a business and the money is going to be used for business purposes. And then I use it for personal consumption. Why is that not a fraud? Because the person who's lending me the money is, has certain expectations about whether it's going to get paid back that are based on the representations that I've made about what I'm going to do with the money. Well, taking the, taking the facts as a whole in this particular case, he would go to, uh, lenders. They weren't really investors in this case. They were lenders and the lenders would business of cell phones and whatever it was, radios. And, and in fact, they did have such a business. Um, the question is whether or not he was a good businessman or a bad businessman. My argument is that this is, this should have been a civil case that he was, he just a bad businessman. He took the money. Um, he did buy some, I think the government's evidence would agree. He did buy some cell phones and, and so forth. He just never really, uh, never pursued it properly and so forth in terms of the, some of these specific, uh, sources of the monies that the government brought out. Um, some of those were normal business expenses. Sure. Did he, did he take investors, uh, lenders out for dinner? Uh, did he take them on a trip and so forth? I don't know. IBM seems to do that all the time, I guess. So my argument is that this, this race recently really should have been a civil case. Uh, and in fact, at least one of the people involved did bring a civil action to, to attempt to get back his money. Um, but, but our argument is that the crime victims bring civil cases if they have a defendant who is not judgment proof. See, I don't see why the fact that somebody sued someone who defrauded him makes it not a criminal case. I didn't, I don't, I wouldn't imply that. I'm just saying that, that in fact, someone actually did do that and they could have done that. Um, the government's not a collection agency, obviously. Uh, this is the, the, our claim here is that these were, these were loans and everyone knew they were getting the money. And my argument that, which that ties into is the, is there any case that you can cite that says if, uh, a person makes fraudulent representations in order to get a loan, that's okay because it's only a loan that alone can be used for any purpose. And therefore it doesn't matter what the borrower says he's going to use the money for. No, I know there's no law in that regard, but, but the exact language of the, of the loan itself, which was drafted by, by counsel, competent counsel, uh, indicates in fact that he was going to use the money to fund his business, uh, business operations. And I think to the most, to the most part, you could, you could argue that in fact, that's what happened with regard to these expenses. You could argue it. And then the jury decides whether it's true or not. And they can argue that the government can argue the opposite. Well, that, that sort of takes me to, to my next argument, which was the, the, the Crawford argument, which isn't really, it isn't really a classic Crawford argument. My, my, my say the least to say the least. Absolutely. My argument is that, that what happened here was functionally identical. However, to live testimony, the government puts on 11 people. They testify as to what happened, what Mr. Bick said. My cross-examination essentially had to do with the fact that, uh, they were looking for a high rate of interest, 50%. Uh, they were looking for the money. Really. They knew they were loans. Um, they knew they were three times as old as he was. They were really taking advantage of him and so forth. And that was my, that was the basis of a lot of the cross. Then the government puts on an FBI agent who says, by the way, here's nine more contracts. Here's nine more contracts. And, and the contracts themselves are the loans, which is still a contract where the basis, the nub of this entire case. And so by putting on these nine contracts, I was deprived of the opportunity of cross-examining, uh, those people. In this case, it was significant because essentially the government. Some of those contracts, uh, bore your client signature. Am I right about that? Uh, yes. Some did. So it's hard to see how this could possibly be testimonial for confrontation clause purposes, because your client didn't create the agreements to have them introduced a trial against him. Absolutely not the prime. I mean, I agree. Yes. The primary purpose of these documents was not to prepare to TV and use the trial, but they're functionally equivalent and they're functionally identical to live testimony because what the government, the government says, well, we're not offering this for the truth of the matters asserted. But when you, when the entire case so far has been these contracts and the entire case so far has been people testifying about how horrible Mr. Bic was as to these contracts. And then you say, oh, by the way, here's another nine. We're not offering them for a, for the truth of the matters asserted in there. Well, of course you are, but I'm just being deprived. Mr. Bic is being deprived of the right then to cross-examine those people. Please bear in mind that in this particular case, there were two types of contracts, if you will, loans and contracts. Uh, one had to do with his, his so-called cell phone business. The other had to do with his concert business. The jury found him not guilty with regard to the, to the contract business. So there was obviously at the site, the concert business. So there was obviously some concern in the, in the juror's minds, I believe that in fact, it wasn't, it wasn't all that clear cut about, about what Mr. Mr. Bic was up to. And in fact, people may have been trying to take advantage of him, which is why I think the cross-examination was so necessary as to these other nine contracts. I concede it's not, I mean, it's clearly not a Crawford issue, but it bothers me in my gut that the government can put on an agent, any agent, and then, and why do we have trials then just put on the agent and say, what's the evidence agent? And the agent rattles off documents and so forth that have been seized and the government sits down. And that's, that's what bothers me here. Granted, there were, there were 11 people, 11 witnesses who testified first as to similar, almost identical contracts. And that's why, that's why I'm bothered by the that as to the remaining nine contracts that were put on in this, in this fashion, that there was no cross-examination allowed. So I, yes, I concede that the primary purpose wasn't, but you know, it's, it's, it's, it's so unclear in this area as to how far the government can go. I guess the best I can say is it was an alternate purpose. It's definitely not a primary purpose, but certainly it served the government's government's interest in showing the jury that, hey, look at this, here's another nine. Thank you. Good afternoon. May it please the court, Mike McGarry from the U.S. Attorney's Office for the United States of America. I'd like to start off by saying that there's no reason, none set forth in the appellate's brief and none said today that would lead this court to upset the verdicts of The government introduced more than sufficient evidence for each of the counts of conviction and viewing the evidence in the light most favorable to the government, crediting every inference in the government's favor, the trier of fact here, the jury, clearly could have and did find every essential element beyond a reasonable doubt. This was a straightforward Ponzi scheme. The district court made no errors. The admission of the contracts, the emails, the checks was proper. The evidence is not testimonial. I think it's been conceded today that it would fail the primary purpose test as the primary purpose was for Mr. Bick to get money. He used the contracts as part of his scheme. As far as the other counts, there was certainly sufficient evidence as to the money laundering and certainly sufficient evidence as to the wire fraud. I think Could you clarify for me a little bit about these nine contracts? I'm just trying to understand what they were used for. Are these contracts, Mr. Einhorn suggested these are contracts that essentially are an extension of the scheme in the sense that you have certain victims testify and then you put into evidence that, oh, by the way, there were also nine other investors. Is that the point? No. The point is or was that you've got the core of the scheme. You've got the scheme ostensibly established. Then you have the victim's money being spent. The jury knows what a jet ski is. They know what the sunglasses hut is. They know what Embassy Suites and Ruth Chris Steakhouse is. Then there are these other names that appear in the bank records. Mr. Galante, Mr. Pinto. If you look at the $50,000 that the Burks invested on July 26th after $1,800 was in the account. Then after that, the Palme family put in $50,000. Then there was a check from another person who testified, Mr. Henry Scazzafava. Then you start seeing the spending. At some point as you go through the bank records, if you would go to the government's appendix at 728, for instance, you'll see a $10,000 check to an Anthony Galante. Who is that? Well, by putting in the contract emailed by Mr. Bick, signed by Mr. Bick, you're in essence showing how the money was spent. Oh, so these are not these contracts that Mr. Einhorn referred to, the nine contracts are not contracts with investors, but are contracts with other people for the purchase of goods or things of that kind. Is that right? No, but close. There are contracts with other investors, but in the Ponzi scheme, money went back to them, whether it was in the music venture part of the business or the electronics part of the business, but they were introduced to show how the money is spent. So this is about how the money was spent. Because Mr. Einhorn implied that he wanted to get those people in to cross-examine them about what representations were made to them, but they're not being presented as other fraud victims who were lied to, necessarily. They're people who got the money. They got the money. They're the, not to mix... You may think that they were defrauded also, but they actually are the early investors in the Ponzi scheme who suffered no loss or little loss because they're getting money back out of the people who are testifying, out of the proceeds of the loans made by the people who were there to testify that they were told this was going to be used for some business purpose. Correct, and not to... And they come in, the contracts come in not for their truth or operative documents, their contracts, and they're authenticated by the defendant's signature? Is that the... Well, they were... I'm just curious. Some of them were seized pursuant to a search warrant found in his Yahoo account where he was emailing signed copies of the documents. So it would be a statement of the defendant, in essence, by emailing it. It's also a statement of the defendant because he signed it. And as the court pointed out, they're not offered for the truth of the matter as to the text of the contract, I'll use your money to buy electronics or I'll use your money for business purposes, but to kind of color in the edges of the scheme as to who these people are. And they obviously were not made for the purpose of being introduced at a trial. Correct. They were made by Mr. Bick. The emails were sent by Mr. Bick as part of his scheme. And the ones that were not seized pursuant to a search warrant were produced pursuant to a subpoena served on the defendant's companies for his business records. So the primary purpose was to eliminate any question that the jury would have as to these names appearing in the bank records. And if you go through the government's appendix 728, which sets forth government's trial exhibit 64, you'll start to see these names. As a general matter, you don't need to know precisely who they are because the lion's share of the money is spent anyway. I mean, the $50,000 comes in, $21,000 goes to the jet ski. The fraud is afoot. The fraud is, in essence, proven. We don't have to prove where every dollar goes. But to the extent that the jurors are looking through the evidence and says, what is this? Well, I know what Embassy Suites are, but I don't know who Anthony Galante is. I know Mastro's Steakhouse of Beverly Hills is probably a steakhouse in Beverly Hills, but who is this Jonathan Pinto? Well, those contracts were then summarily introduced to eliminate any question that the jurors might have. I understand that. Thank you. I guess the other point that I'll make briefly, though the court hasn't inquired, is that as to the countrywide argument or as to the argument as to did he have intent at the beginning, clearly the pitch that he made to the individuals, the way that the money was used, he told people they were making sizable profits, but they were not. He said that he was buying large quantities of pallets of electronics. The co-conspirator testified that that wasn't true, that they only bought a small amount. And when you look at the timing of the counts of conviction, which is July 25th, is the first count of conviction chronologically. It is a $30,000 wire back to the Burke family that's made up of money from other people, including Mr. Tepper, who also testified. And after they get their $30,000 back, thinking they've made a profit, they turn around and give the $50,000, which is also a count. I believe that's count 10, which then also supports count 14, which is the money laundering. So clearly the jury was able to conclude that he had intent at the time he was making the false representations. And just to go back to the documents, which the court talked about, if we look at the Weaver case, which was per curiam by this court, it talks about how fraudsters cannot escape criminal liability for lies told in connection with by inducing victims to sign contracts of disclosure or reliance. I know the court is familiar with that case, but that certainly says that whether or not these vague contracts set business purposes, that is not sufficient to cure the false statements that he was making, that he could make a 50% return, that he was buying electronics, that he had bought pallets. And then nor does it cure the fact that the jury could look at the bank records and see by his conduct, by how he was using the money, that when he was making those representations, it was false. Finally, he kept making lies afterwards, which I think the jury could use to establish or to buttress the fact that his statements made at the time were false. Judge Meyer found that there was fraud at the outset, and I submit that the evidence supports that. So I guess I would just say that there was more than sufficient evidence to support the convictions on all the counts. And if the court doesn't have any more questions, I respectfully ask that the court affirm the convictions on all the counts. Thank you very much. If I may, just two things. First of all, under Countrywide, it's not enough that somebody lies after the fact. In Countrywide, there had to be a finding that at the time that the fraud happened, that the fraudulent inducement happened before the contract was entered into, and the government talks about Mr. Biggs lying afterward, telling people things afterward, and that's not enough to satisfy Countrywide. But with regard to the nine contracts, which still bothers me, the facts in this— I don't really understand your point there. In your brief, the only argument you made about those contracts, if I read your brief correctly, was a confrontation clause objection. You orally here today more or less conceded that there's no confrontation clause problem. So what you're now saying is that just bothers you, your sense of time with respect to these contracts in your brief to this court. So why should we even spend any time on it now? When I said that I concede that it's not a— I think my exact language was, I concede it's not a classic confrontation issue, but I still believe it is. What I mentioned was that I believe that the contracts, the use of those contracts, was functionally equivalent to testimony. That was my point. Taking it with the whole scheme, the government's trial scheme to put on 11 people live, nine people through the contracts— Every document that's admitted over a hearsay objection is in some sense testimonial, but that's not the confrontation clause test. And among the tests is whether it was prepared for the purpose of testimony and trial, which these so clearly were not. Well, what I was suggesting earlier is that it was an alternate purpose, and that even though they were clearly not prepared for the purpose of trial, as Your Honor's heard in the last case, which seemed to be the issue, in this particular case, the use of these documents denied Mr. Bick the opportunity to cross-examine their makers or having the procedure the government followed. They were not early investors, Your Honor. These people were not—this wasn't a case of the government showing where the money went. They could have just showed bank statements in that case or checks in that case. They didn't do that. When the government says these were just for the purpose of showing payment, that's not what— I don't understand. What is it that you say was so harmful about them then? There was no opportunity to cross-examine— About what? About what? What is it that they were being used by the government to do that would have been defeated by cross-examining the people on the other side of the contract? Specifically, what did Mr. Bick say to you? Who cares? Were they identified as victims by the government? Well, I mean, I think any reasonable jury would assume they're victims. There are nine more contracts of the same quality, of the exact same identical contracts to the 11 that people Why would any juror think, aha, he had a contract with this person? I don't believe any of those other witnesses. I think that's not a fraud. But the people who we didn't even hear from, that's a fraud? Well, I think you're talking about a volume argument. You've got 11 contracts where people were cross-examined as to their motives and as to what Mr. Bick said, and then you just put on nine without the opportunity then to ask those people, what did Mr. Bick say to you? What was your understanding? Why did you go into these? How did the prosecutor use the contracts in summation? I can't recall. I apologize. I have no recollection. That seems it would be important because it sounds like what you're saying is that there, you think that there was a Rule 403 problem with the admission of these contracts and it would be, that would depend on if the prosecutor argued them in a way that you think went beyond whatever they might show. I don't want to mislead the court. I can't recall. Was there ever an objection to their admission on 403 grounds? I believe I did and the government and the court ruled that they could be admitted not for the truth of the matters asserted in the contracts. That would be the hearsay issue. Well, it's a hearsay. Yes, Your Honor. I realize. Not the 403 issue. 403. That was too, that it was prejudicial. I don't know that I raised a 403 issue exactly. I think it was more an issue about, I objected to them being admitted in any instance and the government said, well, they're not, I guess they're hearsay and the government indicated, well, they're not offered for the truth of the matters asserted. So they went in. Thank you. Thank you both.